UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TWEATHERFORD, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Cause No. 1:16-cv-783-WTL-DML** |
| | ) | |
| 3D SYSTEMS CORPORATION and | ) | |
| 3D SYSTEMS, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |

## ENTRY ON DEFENDANTS' MOTIONS TO DISMISS

This cause is before the Court on the following two motions filed by the Defendants: a motion to dismiss for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3) (Dkt. No. 19) and a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim as to all claims against 3D Systems Corporation (Dkt. No. 21).  The motions are fully briefed, and the Court, being duly advised, hereby **DENIES** the Defendants' motion to dismiss for improper venue and **GRANTS** the Defendants' motion to dismiss for failure to state a claim as to all claims against 3D Systems Corporation for the reasons set forth below.

## I.    BACKGROUND

The facts of record relevant to the Court's decision follow.  Additional relevant facts are included in the Discussion section below.

Tweatherford, Inc. ("TWI") is a business incorporated under the laws of the state of Indiana, with its principal place of business in Cicero, Indiana.  Defendants 3D Systems Corporation ("3D Corp.") and 3D Systems, Inc. ("3D Inc.") are businesses incorporated under the laws of Delaware and California, respectively, with principal places of business in Rock Hill, South Carolina.  3D Corp. and 3D Inc. "are in the business of designing and manufacturing

three-dimensional modeling and prototyping systems and operating a comprehensive service

bureau offering rapid prototyping and manufacturing services for the production of precision

parts." Dkt. No. 20-1 at 6.  Effective December 30, 2010, TWI became an "Authorized Reseller"

of 3D Systems' 3Dproparts parts and products and its V-Flash Desktop Modeler and associated

materials.[1]  *See* Dkt. No. 20-1.  "'Authorized Resellers' are those companies [3D Inc.] appoint[s]

to distribute and sell [its products] because they maintain or are capable of developing

relationships with potential customers."  *Id.* at 6.  TWI and 3D Inc. executed the following three

documents: "Reseller Agreement," "Enabling Agreement for 3Dproparts[TM] Parts Service" (the

"3Dproparts Agreement"), and "Enabling Agreement for V-Flash[TM]" (the "V-Flash Agreement")

(3Dproparts Agreement and V-Flash Agreement collectively referred to as the "Enabling

Agreements").  *See id.* at 6, 13, & 19, respectively.

"In 2013 and 2014, representatives from 3D Systems, Inc. and/or 3D Systems

Corporation informed TWI of a plan to create a distributor or reseller network that produced

product on 3D Systems machines for third parties ('Distributive Printing')."  Dkt. No. 27-4 at 2.

TWI received a purchase order from 3D Inc. dated June 27, 2014, for a new ProX 300 Direct

Metals printer (the "ProX 300 Printer"), which included a 12-month warranty.  Dkt. No. 1-1 at

12-13.  TWI purchased the ProX 300 Printer to make parts for customers through its parts

---

[1]  "3D Systems" is ambiguous in the Enabling Agreements, but read together with the terms of the Reseller Agreement, "3D Systems" refers to 3D Inc., the contracting entity.  *See* Dkt. No. 20-1 at 6 ("THESE RESELLER TERMS AND CONDITIONS (THESE 'RESELLER TERMS') ARE ENTERED INTO AS OF THE EFFECTIVE DATE INDICATED ABOVE (THE 'EFFECTIVE DATE') BETWEEN 3D SYSTEMS CORPORATION OR ONE OF ITS AFFILIATED COMPANIES AS IDENTIFIED ON THE SIGNATURE PAGE OF THESE RESELLER TERMS ('3D SYSTEMS', 'WE', 'US', OR 'OUR')") and Dkt. No. 20-1 at 13, 19 ("THESE WORDS HAVE . . . THE MEANINGS GIVEN TO THEM IN THE SECTION IN WHICH THEY ARE FIRST USED, OR IF NOT SO DEFINED, THE MEANINGS GIVEN TO THEM IN THE RESELLER TERMS.").

2

business and to be used as part of its showcase for potential customers.  *See id.* at 7; *see also* Dkt. No. 27-4 at 2 ("TWI purchased the [ProX 300] Printer in order to participate in 3D's Distributive Printing program.").  TWI bought the ProX 300 Printer from 3D. Inc. for $603,150.00, and with its payment on January 29, 2015, paid 3D Inc. in full for it.  Dkt. No. 1-1 at 1-2.  In February 2015, the ProX 300 Printer stopped working and has not worked since.  *Id.* at 2.  TWI discovered that the ProX 300 Printer "is actually a used unit, three [] or four [] generations behind what 3D represented [it] was to TWI at the time of purchase."  *Id.*  TWI "contacted 3D on numerous occasions to request service for the [ProX 300] Printer," but "3D has failed and refused to service the [ProX 300] Printer."  *Id.*

TWI filed this suit for breach of contract, breach of warranty, fraud, and UCC fraud against 3D Corp. and 3D Inc.

## II.      DISCUSSION

### A.      Failure to State a Claim against 3D Corp.

In reviewing a motion pursuant to Rule 12(b)(6), the Court "must accept all well pled facts as true and draw all permissible inferences in favor of the plaintiff," *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012), and determine whether the complaint provides the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests," *id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (omission in original). In addition, "[the] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Roberts v. City of Chicago*,

3

817 F.3d 561, 564-65 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678).  Legal conclusions or bare

and conclusory allegations are insufficient to state a claim.  *Iqbal*, 556 U.S. at 678, 680.

The Defendants move to dismiss all claims against 3D Corp. for failure to state a claim.

All allegations in the complaint treat 3D Corp. and 3D Inc. as one entity, referring to them

collectively as "3D" and alleging that, together, they took the actions alleged.  Ordinarily the fact

that 3D Corp. denies taking any of those actions would be irrelevant in the context of a Rule

12(b)(6) motion, as the sufficiency of a complaint is measured by the facts as alleged, not as they

actually exist.  However, as TWI describes in its response brief, it "purchased a three

dimensional printer [the ProX 300 Printer] and warranty from 3D [] Inc. (the 'Purchase

Transaction')," and "[e]ach of the Counts in [its] Complaint relates to or arises from the Purchase

Transaction."  Dkt. No. 26 at 2 (internal citations omitted).

The Defendants point out that TWI fails to allege any contractual relationship between it

and 3D Corp., arguing that the lack of that allegation forecloses any claim for breach of contract

or breach of warranty against 3D Corp.  Dkt. No. 22 at 3- 4.  They further maintain that, for its

fraud claim, TWI has not alleged any fraudulent statements by 3D Corp.  Dkt. No. 22 at 4.

Instead, the Defendants argue, the only statements upon which TWI could rely for its fraud claim

are those made in the June 27, 2014 purchase order from 3D Inc.  *Id.* (citing Dkt. No. 1-1 at 12).

The Defendants also call attention to the fact that the UCC financing statement (Dkt. No. 1-1 at

17) references 3D Inc.'s June 27, 2014, purchase order number.  *Id.* at 5.  Even though the

statement ambiguously lists the secured party as "3D Systems," the Defendants argue that the

statement nonetheless does not specifically reference 3D Corp, so TWI's UCC fraud claim

against 3D Corp. "is not legally viable."  *Id.*

4

In response, TWI maintains that the Defendants' behavior caused TWI to bring the claims against both 3D Corp. and 3D Inc. *See* Dkt. No. 26 at 3 ("As a result of the fluid use of identity demonstrated by the Defendants themselves, the Counts in [the] Plaintiff's Complaint are made against both 3D Systems, Inc. *and* 3D Systems Corporation.") (emphasis in original).

There are no facts pled in the complaint or referred to in TWI's brief that demonstrate a plausible basis for its assertion that 3D Corp. engaged in any of the actions alleged in the complaint. As TWI itself indicated, all causes of action in its complaint arise out of the sale of the ProX 300 printer from 3D Inc. to TWI. Rather than pleading facts showing that 3D Corp. was involved in that transaction, made fraudulent statements, or filed a UCC financing statement claiming TWI to be its debtor in relation to TWI's transaction with 3D Inc., TWI instead presents only conclusory allegations with respect to 3D Corp. As a result, TWI has not met its burden under the *Twombly/Iqbal* standard and has failed to state claims for breach of contract, breach of warranty, fraud, and UCC fraud against 3D Corp. Accordingly, the Defendants' motion to dismiss all claims against 3D Corp. (Dkt. No. 21) is **GRANTED**.

### B.      Improper Venue

The Defendants also move to dismiss TWI's complaint for lack of venue pursuant to Rule 12(b)(3). Under Rule 12(b)(3), "the district court assumes the truth of the allegations in the plaintiff's complaint, unless contradicted by the defendant's affidavits." *Deb v. SIRVA, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016) (emphasis omitted). In addition, "a court may look beyond the mere allegations of a complaint, and need not view the allegations of the complaint as the exclusive basis for its decision." *Id.* Nonetheless, "a court generally accepts the plaintiff's allegations as true for purposes of the motion to dismiss, as long as the complaint contains

sufficient factual allegations to state a claim for relief that is legally sound and plausible on its face." *Id.* at 810 (citing *Iqbal*, 556 U.S. at 678).

The Defendants argue that venue is improper because the Reseller Agreement and Enabling Agreements entered into by TWI and 3D Inc. mandate arbitration of TWI's claims in Charlotte, North Carolina.[2]  *See* Dkt. No. 20 at 4 n. 4.  TWI does not dispute that it agreed to arbitrate certain disputes, *see* Dkt. No. 27 at 6, nor does it dispute Charlotte as a forum for such disputes.  Rather, TWI alleges that the June 27, 2014, purchase order for the ProX 300 Printer is the agreement that 3D Inc. breached, and the warranty referred to in 3D Inc.'s June 30, 2014, invoice serves as the basis for its breach of warranty claim.  *See* Dkt. No. 1-1 at 6-7.  It maintains that the Reseller Agreement and Enabling Agreements it entered into with 3D Inc. "apply to the narrow relationships defined by the duties and obligations of the parties set forth [in those agreements], and their relationship in the transaction underlying each Count in [TWI]'s Complaint is outside the scope of any such agreement."  Dkt. No. 27 at 1.

"Arbitration is contractual by nature - a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (internal quotation and citation omitted).  Whether the parties agreed to arbitrate the claims at issue in this lawsuit is governed by state-law contract principles. *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011) (citation omitted). Notwithstanding the lack of discussion regarding state law in the parties' briefing, the Court looks to the Reseller Agreement, which contains the arbitration clause at issue in this case, to

---

[2]  For purposes of this Entry, the Court assumes that the following statement in the Reseller Agreement means that arbitration must take place in Charlotte, even though it is not a very precise expression of that sentiment: "The hearing locale will be held in the [American Arbitration Association] office closest to [3D Inc.'s] corporate headquarters."  Dkt. No. 20-1 at 9.

determine which state's law applies. *Id.* The Reseller Agreement states that "[t]he laws of the State of New York . . . will govern these Reseller Terms without regard to the principles of conflicts of laws." Dkt. No. 20-1 at 9. Accordingly, the Court applies New York law in examining whether the parties agreed to submit to arbitration the disputes at issue in this lawsuit. Answering that question will, in turn, determine whether venue is improper for the reasons argued by the Defendants.

Under New York law, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 960 (N.Y. 2001) (internal quotation omitted). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (citations omitted). "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 170-71 (internal quotation omitted).

Here, the Reseller Agreement's arbitration provision is unambiguous regarding which disputes must attempt to be resolved by negotiation and, if not resolved by negotiation, then by arbitration. It reads as follows:

> All disputes relating to these Reseller Terms and any Enabling Agreement will first be attempted to be resolved by negotiation. Any claim that is not resolved by negotiation within thirty (30) days of notification shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The hearing locale will be held in the [American Arbitration Association] office closest to [3D Inc.'s] corporate headquarters.

7

Dkt. No. 20-1 at 9.  The question in this case is whether the causes of action brought by TWI are "disputes relating to the[] Reseller Terms *and* any Enabling Agreement." *Id.* (emphasis added). If so, they would be "claim[s] that [are] not resolved," making them subject to the arbitration clause in the Reseller Agreement.

The Court does not address the question of whether the Reseller Agreement's terms by itself govern the ProX 300 Printer sale because it finds that neither Enabling Agreement applies to 3D Inc.'s sale of the ProX 300 Printer to TWI.  As the preamble for the Enabling Agreements explain, each "ENABLING AGREEMENT AND ITS ATTACHMENTS, TOGETHER WITH THE RESELLER TERMS FORM AN INDIVIDUAL CONTRACT . . . GOVERNING BOTH PARTIES' RIGHTS AND OBLIGATIONS WITH RESPECT TO" the Defendants' 3Dproparts parts and products under the 3Dproparts Agreement and the Defendants' V-Flash desktop modeler and associated materials under the V-Flash Agreement.  *See* Dkt. No. 20-1 at 13 & 19, respectively (emphasis in originals).  Through the 3Dproparts Agreement, "[3D Inc.] authorize[s], appoint[s] and grant[s] to [TWI]: (a) the right to act as [3D Inc.'s] Authorized Reseller to market, sell and distribute the Authorized Products in the Authorized Market and Authorized Territory from the Authorized Locations ('the Appointment'); and (b) a license." *Id.* at 13.  Attachment 1 to the 3Dproparts Agreement defines "Authorized Products" as "3Dproparts." *Id.* at 16.  Among other terms, the 3Dproparts Agreement provides terms regarding shipping and delivery, pricing, and the process for ordering Authorized Products.  Of particular note to the Court is the fact that the 3Dproparts Agreement does not contemplate the Distributive Printing program discussed by the parties in 2013 and 2014.

Similarly, in the V-Flash Agreement, "[3D Inc.] authorize[s], appoint[s] and grant[s] to [TWI]: (a) the right to act as [3D Inc.'s] Authorized Reseller to market, sell and distribute the

Authorized Products in the Authorized Market and Authorized Territory from the Authorized

Locations ('the Appointment'); and (b) a license." *Id.* at 19.  Attachment 1 to the V-Flash

Agreement defines "Authorized Products" as "V-Flash Desktop Modeler & Assoc. Mat'ls." *Id.*

at 22.

In its brief, TWI explained that the "Authorized Products" covered by the Enabling

Agreements "do not include a 3D printer," Dkt. No. 27 at 8, and the Defendants have not

otherwise shown that the ProX 300 Printer is an Authorized Product under either Enabling

Agreement.  Instead, the Defendants point the Court to a sentence that appears in each Enabling

Agreement: "All purchases from [3D Inc.] will be subject to the terms and conditions of this

Enabling Agreement and the Reseller Terms." *See* Dkt. No. 20 at 4-5 (quoting Dkt. No. 20-1 at

13 & 20, respectively).  They argue that such language "settle[s] that 'all purchases' by TWI,"

including the ProX 300 Printer purchase, were covered by the terms of the Enabling Agreements

and the Reseller Agreement.  *Id.* (quoting Dkt. No. 20-1 at 13, 20) (emphasis omitted).  The

sentence, however, cannot be read in isolation.  "[A] contract should be read as a whole, and

every part will be interpreted with reference to the whole; and if possible it will be so interpreted

as to give effect to its general purpose." *Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210, 1213-14

(N.Y. 2007) (internal quotation omitted).  Following that sentence, the remaining terms in the

paragraph outline conditions governing the terms TWI may use in its contracts with customers.

*See* Dkt. No. 20-1 at 13 & 20, respectively.  The provision explicitly refers to TWI's sale of

"Authorized Products to Company Customers." *Id.*  When simply considering the paragraph as a

whole, these are the "purchases" the first sentence concerns, rather than all possible purchases

TWI could make.

This reading is in accord with the remaining terms of each Enabling Agreement as well. The terms of the Enabling Agreements were meant to apply to the Appointment, as defined in each Enabling Agreement, related to the specific Authorized Products, as defined in each Enabling Agreement. *See* Dkt. No. 20-1 at 13, 19. Each Enabling Agreement establishes which products TWI could market, sell, and distribute under that particular agreement and describes the parameters of TWI's ability to market, sell, and distribute those Authorized Products. They each contain, for example, the warranties on the Authorized Products that TWI was "required to pass-through and assign . . . to Company Customers in the same form." Dkt. No. 20-1 at 14, 20. The Enabling Agreements were not meant to govern all aspects of the relationship between TWI and 3D Inc. and do not apply to products outside the Authorized Products defined in each Enabling Agreement. Accordingly, their terms do not apply to TWI's purchase of the ProX 300 Printer.

In addition, the Defendants' reading of the "all purchases" sentence would subject any purchase under one Enabling Agreement to the terms of the other Enabling Agreement, which was clearly not the parties' intention. Rather, the parties intended that each Enabling Agreement cover TWI's purchases of that agreement's Authorized Products, as is made clear by the unambiguous language found in each Enabling Agreement. *See* Dkt. No. 20-1 at 13 and 19, respectively ("THIS ENABLING AGREEMENT AND ITS ATTACHMENTS, TOGETHER WITH THE RESELLER TERMS FORM AN INDIVIDUAL CONTRACT BETWEEN [TWI] AND 3D SYSTEMS GOVERNING BOTH PARTIES' RIGHTS AND OBLIGATIONS WITH RESPECT TO [3D Systems's] 3DPROPARTS$^{TM}$ PARTS AND PRODUCTS"; "THIS ENABLING AGREEMENT AND ITS ATTACHMENTS, TOGETHER WITH THE RESELLER TERMS FORM AN INDIVIDUAL CONTRACT BETWEEN [TWI] AND 3D

SYSTEMS GOVERNING BOTH PARTIES' RIGHTS AND OBLIGATIONS WITH RESPECT

TO [3D Systems's] V-FLASH™ PRODUCTS.") (emphasis in originals).

As the arbitration clause plainly states, it applies to "disputes relating to these Reseller

Terms *and* any Enabling Agreement."  Dkt. No. 20-1 at 9.  Because neither Enabling Agreement

applies to 3D Inc.'s sale of the ProX 300 Printer to TWI, the arbitration clause cannot apply to

disputes related to the ProX 300 Printer.  Thus, venue in this Court is not improper, and

accordingly, the Defendants' motion to dismiss for improper venue (Dkt. No. 19) is **DENIED**.

### III.   <u>CONCLUSION</u>

For the reasons set forth above, the Defendants motion to dismiss for failure to state a

claim as to all claims against 3D Systems Corporation (Dkt. No. 21) is **GRANTED**, and the

Defendants motion to dismiss for improper venue (Dkt. No. 19) is **DENIED**.  The **clerk is**

**directed** to amend the docket to indicate that 3D Systems, Inc. is the only remaining defendant

in this matter.

SO ORDERED: 3/24/17

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification